IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

LAURA PARTEE                                                    PLAINTIFF

          v.              Civil No. 05-6075

MICHAEL J. ASTRUE[1], Commissioner,
Social Security Administration
of the United States of America                                DEFENDANT

### J U D G M E N T

Now on this 27th day of March, 2007, comes on for consideration the Complaint of Laura Partee for judicial review of the denial of Social Security benefits by the Commissioner.  This Court's review is conducted pursuant to **42 U.S.C. §405(g)**.

1.   The Court's role upon review of the decision of a Social Security Administrative Law Judge ("ALJ") is to determine whether the decision is supported by substantial evidence on the record as a whole.  **Ramirez v. Barnhart**, **292 F.3d 576 (8th Cir. 2002)**. Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support a conclusion. *Id*.  The Court must consider not only the evidence supporting the ALJ's decision, but also that which fairly detracts from it, and must affirm if the record -- viewed as a whole -- contains substantial evidence to support it.  *Id*.  The Court may not reverse simply because the record also contains substantial

_____

[1]Michael J. Astrue became the Social Security Commissioner on February 12, 2007, and pursuant to F.R.C.P. 25(d)(1), he has been substituted for Jo Anne B. Barnhart as the defendant in this suit.

evidence that would have supported a contrary decision. **Haley v. Massanari, 258 F.3d 742 (8th Cir. 2001).**

The burden rests on the claimant to prove that she has a disability, mental or physical, that has lasted -- or can be expected to last -- at least one year and that prevents her from engaging in any substantial gainful activity. **Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001).**

2.   Partee alleges a disability onset date of December 3, 2001.  At the time of her administrative hearing, she was 46 years old, and had a high school education.  Her past work experience was as a fast food worker and waitress.

The ALJ found that Partee had fibromyalgia, depression, residuals of remote bilateral shoulder adhesive capsulitis, and gastroesophageal reflux disease controlled with medication.  He found this combination of impairments severe, but not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

The ALJ found Partee's testimony about her limitations not fully credible, and ultimately determined that Partee had the residual functional capacity to perform a significant range of sedentary work, so long as she did not have to perform work above waist level or be subjected to too much stress.  Based on the testimony of a Vocational Expert that jobs with such restrictions existed in significant numbers in the economy, the ALJ concluded

that Partee was not disabled.

    3.    The Administrative Record reflects the following relevant[2] facts:

* On April 29, 1998, Partee was seen by Dr. Dale Kincheloe for pain in her shoulders. She had some limitation in the range of motion of her shoulders. Dr. Kincheloe diagnosed bilateral adhesive capsulitis. He prescribed Advil and physical therapy to regain motions and increase strength.

* On June 10, 1998, Partee saw Dr. Kincheloe again. He noted that she had been going to physical therapy three times a week, and had experienced pain with the exercises. He added Darvocet[3] to the Advil, and continued physical therapy with some modification in the types of exercises. His diagnosis remained the same.

* On July 22, 1998, the physical therapist wrote Dr. Kincheloe, noting that Partee had made modest gains in range of motion, and had been trained in a home physical therapy program.

* On December 29, 1998, Partee saw Dr. Verser with a

---

[2]Medical records pertaining to conditions not relevant to the claim of disability are not included. In addition, the record contains office visit notes dated January 30, 2003, and May 16, 2003, from a practitioner who cannot be identified. These documents are illegible, and so are not included.

[3]Indicated for relief of mild to moderate pain. Physicians' Desk Reference, 1995 Ed.

complaint that "both shoulders are frozen."  She gave Dr. Verser a history of seeing "numerous doctors," and having "50 sessions of physical therapy prior to August, 1998."  He diagnosed bilateral shoulder pain, and prescribed Pamelor[4] and Clinoril[5].

* On June 19, 1999, Partee saw Dr. Verser for complaints of right shoulder pain.  She told him she had been unable to tolerate the Clinoril because of stomach problems. He injected her shoulder with Decadron, and prescribed Celebrex[6].

* On November 1, 1999, Partee saw Dr. Verser for complaints of unresolved shoulder pain.  His diagnosis was fibromyalgia and right shoulder inflammatory pain. He prescribed Vioxx, Celestone[7], and Amitriptyline[8].

* On November 9, 1999, Partee saw Dr. Verser for a twisted right foot.  He prescribed an ACE wrap, Vioxx and Tylenol.

---

[4]Indicated for the relief of symptoms of depression.  Physicians' Desk Reference, 1995 Ed.

[5]Indicated for acute or long-terms use in the treatment of osteoarthritis, rheumatoid arthritis, ankylosing spondilitis, acute painful shoulder, and acute gouty arthritis.  Physicians' Desk Reference, 1995 Ed.

[6]Used to treat osteoarthritis, rheumatoid arthritis, ankylos9ng spondylitis, and acute pain, among other conditions. Physicians' Desk Reference, 2007 Ed.

[7]Used to treat a wide variety of rheumatic disorders, among other conditions. Physicians' Desk Reference, 1995 Ed.

[8]Sold under the brand name Elavil, this drug is an antidepressant with sedative effects.  Physicians' Desk Reference, 1995 Ed.

* On July 18, 2000, Partee was seen by Dr. Verser with a complaint of a swollen painful foot.  He noted a history of "frozen shoulder" and neck and shoulder pain.  Vioxx was prescribed.

* On October 5, 2000, Partee was seen by Dr. Mike Verser for a refill of her medication.  The diagnosis was fibromyalgia and shoulder pain, and prescriptions were written for Vioxx and Amitriptyline.

* On January 3, 2001, Partee saw Dr. Melody St. John, a Rheumatologist, with complaints of a frozen shoulder, pain in her back, hands, feet and neck, stiffness, "charley horses" and leg cramps at night, difficulty sleeping, diarrhea and constipation, a feeling "like she has a fever all over," and painful breathing.  At that time, Partee was taking BC powders, Vioxx, Elavil, vitamin C, magnesium, calcium, Aluna, and Exlax.  Dr. St. John diagnosed arthralgias, myalgias, frozen shoulder, headaches, peptic ulcer, and depression.  She prescribed Prozac[9], Steri-Pred dose pack, Flexeril[10],

---

[9]Used to treat major depressive disorder, among other conditions.  Physicians' Desk Reference, 2007 Ed.

[10]Used in the treatment of muscle spasm associated with acute painful musculoskeletal conditions.  Physicians' Desk Reference, 1995 Ed.

Ultram[11], and Mobic[12].  She sent Partee for laboratory tests, and told her to return in two weeks.

* On January 17, 2001, Partee returned to Dr. St. John. Her lab tests had all been normal.  Partee was sleeping better on the medication regimen Dr. St. John had prescribed.  She had some pain and limitation with range of motion testing in her shoulders, but good range of motion in her elbows, wrists, hips, knees, and ankles. Dr. St. John renewed the Ultram prescription and gave her some samples of Relafen[13].  She was to return in two months to be reevaluated for "possible seronegative rheumatoid arthritis."

* On January 30, 2001, Dr. Jerry Thomas did a Functional Capacity Assessment of Partee, without benefit of a treating source statement.  He indicated that Partee could occasionally lift 10 pounds, and frequently lift or carry less than 10 pounds;  that she could stand or walk 2 hours in an 8-hour workday, and sit, with normal breaks, for about 6 hours in a workday.  He opined that she should be restricted from work requiring the ability

---

[11]An analgesic used to treat moderate to moderately severe chronic pain when around-the-clock treatment is needed for an extended period of time.  Physicians' Desk Reference, 2007 Ed.

[12]A non-steroidal anti-inflammatory drug.  Physicians' Desk Reference, 2007 Ed.

[13]Used in the treatment of acute and chronic osteoarthritis and rheumatoid arthritis.  Physicians' Desk Reference, 1995 Ed.

to push or pull with her upper extremities above waist level.  No other limitations were reported.  This RFC was affirmed by Dr. Ronald Crow on May 31, 2002.

*   On March 19, 2001, Partee returned to see Dr. St. John. She complained of swelling in her legs, and jerking of her legs at night, with trouble standing in the mornings.  She had decreased range of motion in her shoulders, but otherwise good range of motion.  Dr. St. John took Partee off Relafen and Ultram, put her back on Prozac, increased her Elavil, and gave her samples of Day Pro.  She was to return to the clinic in three or four months.

*   On July 11, 2001, Partee returned to see Dr. St. John. She complained of pain in her hands, occasional trouble turning the pages of a book, leg spasms, being stiff in the mornings, difficulty walking, and constipation.  She was taking Flexeril, Ultram, BC powders, vitamin C, magnesium, calcium, Aluna, Exlax, and Relafen.  Dr. St. John prescribed Klonopin[14], discontinued Elavil, and told Partee to return in one year.

*   On December 18, 2001, Partee contacted Dr. St. John's office with complaint of a charley horse that made her unable to stand, and then left her leg sore.  She was

_____

[14]Used in the treatment of seizure and panic disorders. Physicians' Desk Reference, 2007 Ed.

told that "this is normal."

* On December 26, 2001, Partee completed a Disability Report - Adult. She indicated that her ability to work was limited by fibromyalgia, which made it hard to use her hands and to walk, and caused spasms. She had stopped working on February 1, 1998, because of this condition. Her medications at that time were Flexeril, Prozac, Elavil, and Klonopin.

* On January 4, 2002, Partee completed a Disability Supplemental Interview Outline. She indicated that she could not bathe, dress, shave, or care for her hair without assistance, because it was hard to hold her shoulders and arms up, and hard to stand on her right leg. She could wash dishes, but not do laundry, change sheets, iron, vacuum or sweep, take out the trash, rake leaves, do garden work, or drive long distances. If she did do something like vacuum or sweep, she would not be able to walk the next day "for pain." She did some grocery shopping, but did not shop for clothes or do banking. She said that her fingers were usually "frozen" and on such days she could not write or do other things using her fingers. She cooked, but it took longer than before her disability began. She had a "terrible short term memory." She used a cane. She

-8-

spent her time attending church, watching television, listening to the radio, and reading, although it was hard to turn pages. Her disability had interfered with her work when her shoulder became "frozen," and she could not "lift anything or move my hand and arms." She suffered from unusual fatigue and required naps. She had to be helped out of bed because tendons would "stick out of right leg and that makes me sick." The pain, located in both legs and feet, and on her right side, interfered with her sleep. She also noted "terrible" diarrhea about once a week. She did stretching and stepping exercise, and took Elavil, Prozac, Klonopin, and Daypro[15]. She had discontinued Vioxx because of side effects. She noted that she had taken "so many steroids at first" that she gained 60 pounds in two months. She gave the following narrative statement: "My life has changed. I am only 44 & can't hardly stand the pain. I am up all night for leg spasms. I used to love bingo, swimming, shopping, & driving my car & now I can't even wash & dry my hair or lift laundry out & in dryer or turn pages in bible at church. The pain & stiffing [sic] of my body has changed not only my life, but my family's. I feel I am turning into stone."

---

[15]Used in the acute and long-term treatment of osteoarthritis and rheumatoid arthritis. <u>Physicians' Desk Reference</u>, 1995 Ed.

\*     On January 11, 2002, Partee saw Dr. William Wright with
complaints of fibromyalgia and a history of hurting her
shoulder while working as a waitress.  She had decreased
range of motion in her right shoulder, and decreased
sensation in her finger tips and toes.   Dr. Wright
recorded that Partee was "unreceptive to treatment
suggestion about diet and exercise," and appeared
depressed, with a flat affect.   His diagnosis was
fibromyalgia and irritable bowel syndrome.  He made no
changes to her medication regimen, which at that time
included Elavil, Klonopin, Prozac, and Flexeril.

\*     On January 14, 2002, Partee completed another Disability
Supplemental Interview Outline.  She indicated that she
could wash dishes and iron, shop for groceries, and do
her banking and post office errands, but could not
bathe, dress or care for her hair without assistance, do
the laundry, change the sheets, vacuum, sweep, take out
the trash, or shop for clothes.  She explained that her
arms would not "go back that far" to bathe or dress
herself, and that she had trouble holding her arms up to
wash her hair.  Vacuuming hurt her back, and while she
could put clothes in the washing machine, lifting them
from the washer to the dryer caused "terrible pain."
She did prepare meals daily, although it took longer

-10-

than before, and she drove short distances only.  She
walked for exercise or errands, but used a cane.  She
attended church, watched television, listened to the
radio and read.  Her impairments had forced her to quit
work because she could not lift the weight that was
required.  She suffered from unusual fatigue, chronic
pain in her hands, forearms, and legs, mainly of the
right side but also in her left hand and foot.  She had
pain every day, which interfered with her sleep.
"Simple chores" like mopping or trying to bathe would
make her pain worse.  She was taking Elavil, Prozac,
Klonopin, and Flexeril, and noted that she had had to
discontinue taking Vioxx, Clinoril, Daypro, and
hydrocodone because of side effects.  She concluded with
the statement "I don't know how to explain what it is
like living with this horrible pain.  I am so stiff all
the time I feel as if I am turning to stone.  I also
can't afford my medicine.   I also have terrible
diarr[hea]."

* On April 1, 2002, Partee completed a Reconsideration
Disability Report.  She indicated that her pain had
increased, her fingertips were always numb, and that she
had difficulty writing or using her fingers to turn
pages or pick things up because of numbness and

-11-

swelling.  She noted that filling out the form had
caused her right hand to "really hurt[]." Cooking had
become difficult.  Her arms were "frozen" at the rotary
cuff, and would only go back "even with my side." Her
left foot also swelled.  She stated that she usually had
either diarrhea or constipation, and had gained 50
pounds since she first got sick.  Leg spasms sometimes
left her legs sore to the touch for weeks.  She had
trouble bathing, and her husband had to help her shower
and wash her hair.  She could not drive very far, due to
pain, or hold a book and turn the pages.  She did
stretches and yoga daily "to keep from freezing more,"
and had had 50 ultrasound treatments.

*      In a Vocational Analysis written on January 30, 2002,and
       affirmed on the basis of current medical records on May
       31, 2002, Vocational Analyst Sondra Stone opined that
       Partee retained the capacity to perform a wide range of
       sedentary work, including surveillance-system monitor,
       school bus monitor, and airline security representative,
       all described as "sedentary to light level exertion jobs
       that do not require bilateral hand usage."

*      In an undated Claimant's Statement When Request For
       Hearing Is Filed And The Issue Is Disability, which
       appears to have been prepared about July 15, 2002,

-12-

Partee indicated that her hands were experiencing more pain, for longer periods of time; that her right forearm and calf hurt; that she was having "[m]ore problems with running low grade fever and speech difficulty recently." She had stopped attending church due to pain and stiffness, and used a cane for about 20 minutes when she got out of bed in the mornings.  She was taking Elavil, Klonopin, Prozac, and magnesium.

*    On August 2, 2002, Partee saw Dr. Brenda Ketcher with a complaint of a large volume of rectal bleeding, associated abdominal pain, and alternating diarrhea and constipation.  She was anemic.  Dr. Ketcher planned a colonoscopy.  Partee was taking BC Powder, Valium[16], Flexeril, Elavil, Ultram, Fiber Choice, and Klonopin.

*    On August 16, 2002, Partee had an EMG and nerve conduction study at the request of Dr. St. John.  Both studies were reported as normal.

*    On August 20, 2002, Partee had a flexible sigmoidoscopy with polypectomy.  The procedure could not be completed because of adhesions and looping in the pelvic area. Diagnosis for the areas that could be viewed included polyps, irritable bowel syndrome and hemorrhoids (the

---

[16]Useful in the treatment of anxiety disorders as well as for the relief of skeletal muscle spasm due to inflammation of the muscles or joints.  Physicians' Desk Reference, 2007 Ed.

-13-

cause of the bleeding).

* On December 2, 2002, Partee saw Dr. William Beebe with complaints of shortness of breath, congestion, and cough. Dr. Beebe treated Partee for an upper respiratory infection, but noted in the process that "she seemed very weak standing from a seated position," and that she reported "having trouble with weakness of her legs and arms over the last 1-2 years." Dr. Beebe decided to refer Partee to a neurologist to evaluate this weakness.

* On August 15, 2003, Partee saw Dr. Ross Bandy for evaluation of her musculoskeletal symptoms. She told Dr. Bandy that she had been diagnosed with fibromyalgia, and reported numbness in her fingertips; discomfort and swelling in her fingers, worse with flexion; swelling and discomfort of her right forearm; discomfort in the right scapular area; fullness and tenderness in the right calf; occasional left foot swelling; poor sleep; confused thinking; depression; and headaches. She noted that Flexeril caused her to be groggy, and Daypro, Vioxx and Celebrex made her nauseated. She was currently taking clonazepam[17], Hyoscyamine[18], Fiber Choice, Coral

---

[17]The active ingredient in Klonopin. Physicians' Desk Reference, 2007 Ed.

[18]Used to treat irritable bowel syndrome. Physicians' Desk Reference, 2007 Ed.

Calcium, Magnesium, Flexeril (about every two weeks), and glucosamine/chondroitin. Dr. Bandy observed that Partee became "teary-eyed intermittently when discussing her mood." His impressions included polyarthalgias and questionable polyarthritis of the proximal interphalangeal joints[19]; right scapular muscle discomfort; swelling and tenderness of the right forearm; sleep disturbance, probably secondary to mood; depression; and decreased internal rotation of the shoulders. Dr. Bandy made Partee an appointment with Dr. Charles Lane, a Psychiatrist, and planned to discuss Partee's physical problems with her primary care doctor, as well as ordering a variety of tests.

* On August 27, 2003, Dr. Charles Lane conducted a psychiatric evaluation of Partee. Partee told Dr. Lane that "her fibromyalgia has completely altered her lifestyle," that she was reclusive and lacked confidence around people, and that "she has had great difficulty convincing physicians of the severity of her pain and the degree of restriction that it causes." Dr. Lane opined that Partee's "[c]ontent of thought" was

---

[19]This term refers to the finger joints closest to the palm of the hand. <u>Stedman's Medical Dictionary</u>, 28th Ed.

-15-

"strongly positive for somatic[20] focus."  He diagnosed major depression, and assigned Partee a Global Assessment of Functioning ("GAF") score of 45.[21]  He increased her dosage of Lexapro[22], instructed her to taper off and discontinue Klonopin, added Trazodone[23], and "strongly encouraged" Partee to get regular physical exercise, eat a high protein diet, and "try to increase her involvement in routine outside activities."  She was to return for a medication check on October 13.

\*   On September 5, 2003, Partee returned for a follow-up with Dr. Bandy.  Based on his additional exam, and the results of various tests, Dr. Bandy diagnosed polyarthralgias and questionable polyarthritis of the proximal interphalangeal joints; slight osteoarthritis of distal phalangeal joints[24]; fibromyalgia; right scapular muscle discomfort; swelling and tenderness of right forearm; elevated C-reactive protein; sleep

---

[20]"Relating to the soma or trunk, the wall of the body cavity, or the body in general." Stedman's Medical Dictionary, 28th Ed.

[21]A GAF between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends unable to keep a job). Diagnostic And Statistical Manual Of Mental Disorders, 4th Ed.

[22]Indicated for the treatment of major depressive disorder. Physicians' Desk Reference, 2007 Ed.

[23]Indicated for treatment of depression. Physicians' Desk Reference, 1995 Ed.

[24]This term refers to the finger joints closest to the ends of the fingers. Stedman's Medical Dictionary, 28th Ed.

disturbance, probably secondary to mood; depression; and decreased internal rotation of shoulders.  He advised Partee to take Flexeril daily at 9 p.m., rather than every two weeks, and started her on a trial of Bextra.

* In a letter dated September 23, 2003, Shannon Hale, Partee's daughter, stated that she helped Partee with mopping and dusting, cleaning the bathroom, changing sheets, driving if the trip was one which would last over 20 minutes, cooking, and ironing.  She noted that her mother's hands had deteriorated, and that he handwriting "has become very bad."  She also described depression that caused Partee to not want to leave the house, talk on the phone, or even get out of bed.

* Partee testified at a hearing before the ALJ on September 24, 2003.  She said that her main problem was her hands, which had gotten numb starting about three years earlier.  She said she had fibromyalgia, osteoarthritis, polymyalgia, irritable bowel syndrome, a painful lump on her right leg, swelling of her left foot that made it impossible to wear shoes, and depression.  The numbness in her fingers made it difficult to write.  She testified that Dr. Bandy was the first doctor who had really "given me some care," and would listen to her and help her.  She was taking

-17-

Klonopin, Flexeril, Trazodone, and Lexapro.  At Dr. Bandy's recommendation, she exercised by walking in the lake or pool, by light stretching, and by squeezing balls to work her hands.  She testified that she could not hold her arms up very long, drive long distances, or wash her hair, because "[t]hey just won't cooperate."  The areas most affected by fibromyalgia were her arms, the right side of her back, her lower right leg, and the top of her left foot.  She described pain worsening since she had filed her application for benefits, and said that when she opened her eyes in the morning she would be "just shocked with, with pain."  She slept with pillows under her arms to keep her shoulder blades from going down, which felt like "a tearing motion." Sometimes an arm would get "frozen" in the night, and she would have to have help moving it.  She was able to sleep through the night on her new medication regimen, however, and was not groggy when she awoke.  She did "very light housekeeping" such as dusting and some cooking (which really was mostly just heating things up), but testified that she could not peel a potato or "anything turning in my hands very well."  Her daughter and husband did the housework, laundry and most of the cooking.  In describing her problem doing laundry, she

-18-

explained that she could put laundry in, but could not take it out, of the dryer, saying "I can't seem to pick up anything if I extend my arms out." She could lift a gallon of milk if she used both hands. She went grocery shopping every two weeks, in a store about 20 minutes away, usually with her son driving. Sometimes she would send her son shopping with a list. On a good day she could get up and move around, did not feel "like I need to cry," and could do things like color with her granddaughter. On a bad day, she would wake up "with a terrible fever," not be able to move around, have constipation or nausea, and be "crying all day." She said she had about three good days a week. On days when she had a lot of pain, she had trouble speaking, "trouble getting my words out." She used a three-prong cane in the mornings to get up. Her arms would not "go past my body backwards." Her husband helped her shower and fix her hair. She testified that she was sick of "living like this," and was "very depressed" and isolated.

\*   On November 22, 2003, Dr. Michael Inman conducted a mental status exam of Partee for the Commissioner. She had driven herself to the appointment, an hour away from her home, and noted that she had had to stop and stretch

-19-

and walk midway of the trip.  Dr. Inman observed no problems with Partee's standing or walking, and observed that she "had no difficulty remaining seated for 4 ½ hours, nor evidenced any obvious pain behaviors such as grimacing or moaning."  Partee gave a history of "working in the kitchen at the Fish Ne[]t [restaurant] and hurt my shoulder, my rotary cuff froze.  I had 50 physical therapy appointments, and cortisone injections in my shoulder and hip.  Dr. Verser said it was Fibromyalgia.  Now, I see Dr. Bandy and he has changed my medications, and is looking for why my arthritis is spreading."  Partee described her physical problems as feeling like she had a "tennis ball size lump" in her right calf; feeling wobbly when walking; using a walking stick upon arising; inability to lift anything; writing hurting her arm "terribly"; chest spasms, and "spastic bowels."  She was currently taking Flexeril, Trazodone, Clonazepam, Lexapro, Valium, and prednisone[25].  Partee was anxious, tense and trembling during the exam.  She reported sleeping only 3-4 hours a night, due to pain, and having gained 60 pounds in the past six months.  She told Dr. Inman that she was "getting to where I can't stand the thought of living with this pain the rest of

---

[25]A corticosteroid useful for treating a variety of rheumatic disorders. Physicians' Desk Reference, 1995 Ed.

my life."  She reported that her husband helped her shower and wash and dry her hair and dress; that she did not drive out of town by herself; that her husband did the shopping; that her husband did the laundry and her daughter did the "hard cleaning," but she did dishes and "fast cooking." Testing showed Partee to have a Full Scale IQ of 86 - in the low average range - and Dr. Inman considered her responses to be candid, with no evidence of exaggeration or malingering.  He diagnosed her with pain disorder associated with both psychological factors and general medical condition; major depression, recurrent, moderate; generalized anxiety disorder; and personality disorder, not otherwise specified, with dependent traits.  He did not assign a GAF score.  He opined that her prognosis, with treatment, "would be guarded."

*   On November 26, 2003, Dr. Inman completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental).  He indicated that Partee had moderate impairment in her ability to respond appropriately to work pressures in a usual work setting, but found no other impairments.

*   On June 4, 2004, Dr. Bandy hospitalized Partee for depression.  She arrived agitated and crying, stating

-21-

that she was in "too much pain" and could not "deal with it anymore."  She gave a history of stomach problems, spasm in chest and abdomen, diarrhea, and polyarthritis. She was taking Prozac, Elavil and Flexeril, but said that she had stopped taking Klonopin and Lexapro for financial reasons.  Dr. Alfred Brem diagnosed major depression; chronic pain disorder with physical and psychological components; fibromyalgia; polyarthritis; and probable irritable bowel syndrome.  He estimated her GAF on admission at 30.[26] In sizing up the cause of Partee's problems, Dr. Brem noted "[n]o doubt, she has very serious depression that is complicating her pain and the pain is also making her more depressed."  He prescribed Effexor[27], Darvocet, prednisone, Zanaflex (for "some very unusual muscle tightness in her forearms), and Ambien[28].

4.   Partee contends that the ALJ's decision is not supported by substantial evidence, and that he erred in concluding that she retained the residual functional capacity to perform a full range

---

[26]A GAF between 21 and 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).  Diagnostic And Statistical Manual Of Mental Disorders, 4th Ed.

[27]Indicated in the treatment of major depressive disorder.  Physicians' Desk Reference, 2007 Ed.

[28]A hypnotic agent used in the treatment of insomnia.  Physicians' Desk Reference, 2007 Ed.

of sedentary work.   The second of these contentions is of no merit, inasmuch as the ALJ did not find that Partee could perform a full range of sedentary work.   The first contention, however, calls for further analysis, which in turn leads to the conclusion that several findings of the ALJ are not supported by substantial evidence, and that the case must be remanded with instructions, as outlined below.

5.   The ALJ found that Partee "has sought no significant treatment for her shoulder condition since 1999."   The record reflects visits which include consultation about shoulder pain to Dr. Verser (October 5, 2000); Dr. St. John (January 3, 2001; January 17, 2001; March 19, 2001); Dr. Wright (January 11, 2002); and Dr. Bandy (August 15, 2003; September 5, 2003).   While this is not a steady stream of consultations, it appears that Partee returned for follow-up as advised and took the medications prescribed.   The record also reflects other visits to these same physicians for complaints other than shoulder pain, but consistent with the diagnosis of fibromyalgia, as outlined in paragraph 9, *infra*.   Consistent with the instructions contained in that paragraph, upon remand the ALJ is directed to consider Partee's medical consultations as part of a continuum of seeking treatment for fibromyalgia symptoms, rather than isolating the shoulder complaints from other physical complaints.   "The ALJ must consider the impairments in combination and not fragmentize them in

-23-

evaluating their effects." **Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991).**

6.   The ALJ found that Partee "has generally fair to good control of her depression when she seeks treatment for symptoms or a life stressor precipitates reoccurrence or aggravates her depression," and noted that impairments that can be controlled with medication are not disabling, **Roth v. Shalala, 45 F.3d 279 (8th Cir. 1995).**  This conclusion is not supported by substantial evidence.  The record reflects that Partee was on Elavil when she first consulted Dr. St. John in January, 2001, and that Dr. St. John either added Prozac, or switched her to Prozac.  From that time forward, Partee was prescribed a varying regimen of anti-depressants, including Elavil, Prozac, Trazodone, and Lexapro.  In addition, she was placed on several anti-anxiety medications, including Klonopin and Valium.  When Dr. Lane diagnosed Partee with major depression in August, 2003, she was taking Lexapro and Klonopin.  When Dr. Inman diagnosed Partee with "major depression, recurrent, moderate" in November, 2003, she was taking Trazodone, clonazepam, Lexapro, and Valium.  When Partee was hospitalized for major depression in June, 2004, she was taking Prozac and Elavil. The ALJ is directed, upon remand, to consider what effect Partee's depression and anxiety -- treated by appropriate medications -- will have on her ability to work, and to obtain medical consultations appropriate to this inquiry.

7.   The AlJ found Partee's level of activity inconsistent with her alleged impairments, noting that she could do light housework; cook breakfast and fix her husband's lunch; shop for groceries and drive a car short distances; do exercises consisting of "water walking," stretching, and squeezing balls with her hands; color with her grandchild; attend church; read, watch television, and listen to the radio; and use a checkbook.  This activity list may well be an overstatement of Partee's capabilities.  The record reflects that by mid-2002 Partee had started using a cane to assist her with getting around in the mornings, and stopped attending church because of her pain and stiffness.  In August, 2003, Dr. Lane found that Partee was reclusive and lacked confidence around people.  In September, 2003, Partee's daughter indicated that Partee's hands had "deteriorated" and her handwriting had become very bad, and that Partee did not want to leave the house, talk on the phone, or even get out of bed.  At the hearing, Partee testified that she did "very light housekeeping" such as dusting, and that her cooking consisted mainly of heating up foods prepared by others.  Her daughter and husband did most of the housework, laundry and cooking.  Partee also noted that she had good days and bad days, and that on a bad day she would wake up with a fever, cry all day, and have trouble speaking.  Neither the level of activity described by Partee, nor that parsed out by the ALJ, is

necessarily consistent with the ability to work.   The Eighth Circuit has "repeatedly stated that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." **Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995).** On remand, the ALJ is directed to determine which of Partee's activities indicate an ability to do work, and which -- such as coloring or watching television -- in actuality have little or no bearing on the issue.

8.   The ALJ found that Partee's credibility was "seriously undermined" by her failure to seek consistent medical care.   The record shows that between her alleged onset date (December 3, 2001) and the hearing before the ALJ (September 24, 2003), Partee sought care or underwent testing for her musculoskeletal problems on December 18, 2001; January 11, 2002; August 2, 2002; August 16, 2002; August 20, 2002; December 2, 2002; August 15, 2003; and September 5, 2003.   The medications recorded at these visits indicate that Partee was taking medications for depression and musculoskeletal pain and stiffness throughout this period.   On remand, Partee's pharmaceutical records should be obtained in order to determine whether Partee was refilling her medications during periods when she did not see doctors for several months. The effect of depression on the willingness and/or ability to seek out medical care should also be evaluated.

-26-

9.   The ALJ found that the objective clinical and laboratory findings did not support the level of impairment asserted by Partee, because there was no evidence of muscle weakness or atrophy, reflex abnormality, or "demonstrated degenerative or other type of arthritis."   This analysis ignores the close correlation of Partee's symptoms with those of fibromyalgia. **Stedman's Medical Dictionary, 28th Ed.** (published in 2006), gives the following information on fibromyalgia:

> Fibromyalgia is a disorder of unknown cause characterized by chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by use of the affected muscles. . . . Usually associated fatigue, a sense of weakness or inability to perform certain movements, paresthesia[29], difficulty sleeping, and headaches are found. . . . Fibromyalgia frequently occurs in conjunction with migraine headaches, temporomandibular joint dysfunction, irritable bowel syndrome, restless legs syndrome, chronic fatigue, and depression; symptoms are typically exacerbated by emotional stress. . . . Most patients (90%) are adult women. . . . Most patients experience moderate to severe disability, but symptoms can usually be mitigated by treatment.   Effective treatment programs include education, a regular program of low-impact aerobic exercise, and physical therapy as needed.

Fibromyalgia has only recently begun to be recognized as a "real" medical condition, and many doctors are still either unaware of it, or unwilling to consider it as a diagnosis. Indeed, the 26th edition of **Stedman's Medical Dictionary** (published in 1995) did not even contain a listing for the term.

---

[29]"A spontaneous abnormal usually nonpainful sensation (e.g. burning, pricking)." Stedman's Medical Dictionary, 28th Ed.

-27-

Thus it is not surprising that Partee reported difficulty "convincing physicians of the severity of her pain and the degree of restriction that it causes," as she explained to Dr. Lane in August, 2003.  It would be quite surprising if a woman with an IQ of 86 could effectively mimic the symptoms of this mysterious condition.  Yet the record contains a 4½ year history of pain and stiffness in the shoulders, back, legs and neck;  "frozen shoulders" and a feeling of "turning to stone"; inability to perform certain movements such as putting her arms behind her; numbness of the fingers; sleep disturbances; fatigue; irritable bowel syndrome; jerking legs; and depression.  This combination of symptoms is entirely consistent with what is now known about fibromyalgia.  The ALJ failed to consider whether Partee met the parameters of this condition, and what effect the condition might have on her ability to work, focusing instead on the shoulder pain in isolation.

10.  The ALJ also failed to consider the synergistic effects of pain and depression on Partee's ability to work, and in fact, it appears that neither Partee nor her medical care providers were thinking along these lines until Dr. Beebe referred Partee to Dr. Bandy, who recognized the seriousness of Partee's complaints, including her depression, and referred her to Dr. Lane for psychiatric evaluation.  Dr. Bandy recognized that Partee was in a dangerous tailspin:  she had "very serious depression that is

-28-

complicating her pain and the pain is also making her more depressed." Upon remand, the ALJ is directed to recontact Dr. Bandy to obtain Dr. Bandy's opinion on the effect of Partee's pain on her depression; the effect of her depression on her pain; and the combined effect of pain and depression on her ability to do mental work-related activities.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is reversed, and this matter is remanded to the Commissioner for further consideration pursuant to sentence four of **42 U.S.C. §405(g)**. Upon remand, the Commissioner is directed to conduct the inquiries and take into consideration the matters outlined in this Judgment.

If plaintiff wishes to request an award of attorney's fees and costs under the Equal Access to Justice Act, an application may be filed up until thirty days after the judgment becomes "not appealable," i.e., thirty days after the sixty-day time for appeal has ended. **Shalala v. Schaefer, 509 U.S. 292 (1993); 28 U.S.C. §§ 2412(d)(1)(B) and (d)(2)(G).**

**IT IS SO ORDERED.**

   /s/ Jimm Larry Hendren
**JIMM LARRY HENDREN
UNITED STATES DISTRICT COURT**
